# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WAYNE EDWARDS, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>DONALD SNYDER JR., et al., )<br>)<br>Defendants. ) | CIVIL CASE NO. 02-1196-PMF |

### MEMORANDUM AND ORDER

**FRAZIER, Magistrate Judge:**

Before the Court is the remaining defendants' combined motion for summary judgment (Doc. No. 167). Responses and replies are on file (Doc. Nos. 174, 175, 176). With respect to Count I, against defendant Ruiz, plaintiff is proceeding on a § 1983 claim. He challenges the conditions of his former confinement at Big Muddy Correctional Center in December, 2000, and January, 2001. Plaintiff claims that defendant Dr. Ruiz violated his Eighth Amendment right to be free from cruel and unusual punishment by responding to his serious medical need for diagnosis and treatment of a finger injury with deliberate indifference. Specifically, he claims that an important diagnostic test (X-ray) was delayed and that another important test (MRI) was never ordered or performed. He also claims that Dr. Ruiz did not refer him to a specialist for evaluation or treatment and delayed the initial evaluation and subsequent surgery. In Count II, plaintiff asserts a claim of negligent supervision and training against defendants Bochantin, Laurent, and Wexford Health Services. Specifically, he claims that these defendants failed to override Dr. Ruiz' poor treatment decisions and/or failed to train their co-workers and employees to do so.

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To determine whether there is a genuine issue of material fact, courts construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

## I.    Deliberate Indifference – Dr. Ruiz

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that the Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty upon states to provide adequate medical care to inmates. Failure to provide medical care violates the Eighth Amendment when there is "deliberate indifference" to a substantial risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000). This standard requires the plaintiff to establish an objective element that he faced a substantial risk of harm and a subjective element that the defendant was aware of and disregarded an excessive risk to the inmate's health. *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001). When considering whether an inmate's medical care demonstrates deliberate indifference to his serious medical needs, the Court evaluates the inmate's medical care as a whole. *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir.1997). Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires more than ordinary lack of due care for the prisoner's interests or safety." *Farmer v. Brennen*, 511 U.S. 825, 835 (1994). A medical professional shows deliberate indifference to an inmate's serious medical need when he or she makes a treatment decision representing a substantial departure from accepted medical judgment, practice, or standards. In those circumstances, the Court

may infer that the decision was not based on the exercise of medical judgment.  *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008).

Viewed in plaintiff's favor, the relevant evidence shows that he suffered a traumatic finger injury causing a painful knuckle deformity on December 31, 2000, at approximately 9:30 a.m.  At least two individuals glanced at the injured finger and quickly formed the impression that plaintiff needed a doctor's attention.

Plaintiff was promptly transported to the prison's health care unit, which has an infirmary. The infirmary has patient beds but is not equipped for surgical procedures other than minor procedures such as toenail removal or simple laceration and wound repair.  Although a physician was not physically present in the unit when plaintiff arrived, he received prompt attention from the nursing staff.  The nurses assessed the nature of plaintiff's injury and observed that tissue and bone were exposed through his skin and were contaminated with debris.  They also observed some bleeding from the wound.  They checked plaintiff's vital signs, removed some of the debris from the wound, and wrapped plaintiff's hand.  Cori Reid, a staff nurse, prepared an injury report indicating that plaintiff was being referred off-site for treatment.[1]  During this process, Dr. Ruiz, a licensed physician, was contacted by telephone two times.  Dr. Ruiz had experience in the field of emergency medicine and had performed numerous complex hand surgeries.  He gathered information about plaintiff's condition, considered the treatment options available, and gave the nursing staff verbal instructions.  He declined to send plaintiff to an off-site medical facility for emergency care.  In making that assessment, he considered the nature of the care that would likely be available at Good

---

[1] Cori Reid is now known as Cori Pulley.  To avoid confusion, she is referred to as Cori Reid in this decision.

Samaritan Hospital. He directed the nurses to admit plaintiff to the prison infirmary and prescribed medication (an oral antibiotic dosed four times a day for five days, a pain reliever dosed every four to six hours as needed, and a pain reliever/fever reducer dosed three times a day). He also ordered imaging of the finger by x-ray and immobilization, specifying a bulky, sterile dressing. In following these instructions, the nursing staff found that the extent of the deformity made it difficult to immobilize plaintiff's finger.

Following the second telephone call, defendant Dr. Ruiz decided to drive to the prison. At approximately 12:45 p.m. – more than 3 hours after plaintiff first presented with his injury – defendant Dr. Brian Ruiz arrived at the prison health care unit. He conducted a brief examination of plaintiff's injured finger and checked for signs of circulation deficits and/or neurological damage. He formed the impression that plaintiff had an open fracture/dislocation which could be repaired with hand surgery. Dr. Ruiz continued the treatment initiated by phone and formulated a diagnostic procedure and therapeutic plan. He ordered that images of plaintiff's finger be taken prior to 8 a.m. on January 2, 2001, and directed the nursing staff to soak plaintiff's hand in a solution for 15 minutes prior to 8 a.m. on January 2, 2001. He planned to repair the injury at that time. In making this plan, Dr. Ruiz relied on his medical belief that a short delay with antibiotic therapy would reduce the risk of infection.

On January 2, 2001, Dr. Ruiz administered a local anesthetic and surgically repaired plaintiff's injury in the prison infirmary. During the surgery – a complex procedure requiring retraction of a tendon and multi-layer closure – he removed a foreign body from the wound and repaired the dislocation. Subsequently, Dr. Ruiz provided follow-up care and determined that infection had been prevented. After the surgical incision healed, Dr. Ruiz ordered physical therapy.

Dr. Ruiz did not order immediate transport to an off-site hospital for emergency attention or

treatment and did not immediately drive to the prison and perform surgery. He did not order additional imaging tests (an MRI), and did not refer plaintiff to a surgeon or another specialist for consultation, assistance, or treatment.

At Dr. Elyea's request, the treatment provided by Dr. Ruiz was reviewed by Dr. Cleveland Rayford. Dr. Rayford read plaintiff's records and conferred with the director of nursing and the health care unit administrator. He referred plaintiff to Dr. Gupta, an orthopedic specialist, for an off-site evaluation. Dr. Gupta recommended supervised physical therapy for the injury, which he described as a "dorsal dislocation with tiny chip avulsion fracture."

Plaintiff has pain, limited range of motion in his finger, disfigurement, and sensitivity. He is not able to fully perform his usual activities.

Dr. Ruiz argues that plaintiff has not presented evidence sufficient to satisfy the objective element of his claim. This argument is rejected. Construing the evidence in plaintiff's favor, he has proved that he presented with a finger injury that was ultimately diagnosed as an open dislocation with a fracture. This particular injury required care from trained medical professionals and was treated with complex hand surgery and physical therapy. Medical professionals and lay persons alike easily would (and did) recognize that the injury required a doctor's attention. This evidence satisfies the objective element of plaintiff's Eighth Amendment claim. *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997); *Wynn v. Southward*, 251 F.3d at 593.

Dr. Ruiz also argues that the evidence is not sufficient to show that he responded to plaintiff's need for medical treatment with deliberate indifference. The materials on file show that when Dr. Ruiz assessed, diagnosed, and treated plaintiff's injury, he made some choices that differ from the approach some other medical professionals would have followed. Notations on Cori Reid's

report permit the inference that she expected to transfer plaintiff to an outside hospital for care. Dr. Gupta, a general and orthopedic surgeon, believes orthopedic surgeons should evaluate and treat displaced open fractures. In his work outside the prison setting, x-ray imaging is used as an initial diagnostic tool. Dr. Gupta would have cleansed the wound and performed a surgical repair without delay or with minimal delay. Also, he would have used an external cast or splint to stabilize the fracture. Dr. Gupta believes delay in treating a fractured finger can compromise the outcome by reducing the level of function and range of motion. Dr. Rayford, an internist, would have consulted an orthopedic surgeon. Other prison physicians might not have elected to perform a complex hand surgery.

In support of his argument that the evidence shows inadequate treatment and permits a finding of deliberate indifference, plaintiff relies on various decisions, none of which lend considerable support to his position. The unreported decision in *Stoke v. Sood*, No. 01-C-3778 (N.D. Ill. November 29, 2001) did not apply the deliberate indifference standard to evidence presented on summary judgment and is not particularly instructive. In *Snipes v. DeTella*, 95 F.3d 586, (7th Cir. 1996), an Eighth Amendment claim based on a medical decision to remove a prisoner's toenail without administering anesthetic was rejected. In *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996), it was decided that a one-hour delay in providing medical treatment for a sexual assault injury did not contravene the Eighth Amendment.[2]

The evidence submitted could not reasonably support a finding that Dr. Ruiz ignored plaintiff's finger injury or refused to give professional attention to the health risks associated with

---

[2] The Court declines to judicially notice a general conclusion supported by the medical literature on file. The literature does not describe the culpability of defendant Dr. Ruiz in these particular circumstances.

the injury. Also, the evidence does not demonstrate that the choices Dr. Ruiz made when he responded to plaintiff's need for medical attention and treatment represent a significant departure from accepted professional judgment, practice, or standards. While some medical professionals with different skills, backgrounds, and facilities would have made other choices, the choices made by Dr. Ruiz were not highly inconsistent with accepted judgment, practice, or standards. In particular, no evidence contradicts various medical opinions that the treatment provided by Dr. Ruiz was reasonable, proper, and on par with the applicable standard of care (Doc. No. 1, p. 14; Doc. No. 175-37; Doc. No. 167-11, p. 3; Doc. No. 167-15 p. 2). The only rational inference is that Dr. Ruiz attended to plaintiff's medical needs by exercising his medical judgment. In doing so, he made choices that some other medical professionals with different skills would not have made. At best, plaintiff can show a level of disagreement within the medical community about the best treatment option for an open dislocation and fracture. Such a disagreement is insufficient to support an Eighth Amendment violation. In the absence of evidence that could support a finding that Dr. Ruiz's choices were so far afield from the professional norm that "no minimally competent professional would have so responded under those circumstances," *Sain v. Wood*, 512 F.3d at 895 (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998)), Dr. Ruiz is entitled to summary judgment in his favor.

## II. Negligence – Duty

Defendants Bochantin, Laurent, and Wexford Health Sources (Wexford) seek judgment in their favor on plaintiff's negligent supervision and negligent training claim, arguing that they had no duty to monitor Dr. Ruiz or override his treatment decisions. Plaintiff maintains that defendants Bochantin, Laurent, and Wexford had a general duty to exercise ordinary care which includes the

obligation to train and supervise co-workers and employees and maintain adequate clinical and treatment policies. He claims that defendant Wexford might also be liable under a theory of institutional negligence.

During the relevant period, defendant Wexford held a contract with the Illinois Department of Corrections to provide medical services to certain prison inmates, including those confined at Big Muddy Correctional Center. The contract provided that Wexford would ensure that staff members complied with contract specifications, including a provision directing orientation and pre-service training. Wexford required the nursing staff to participate in the Illinois Department of Corrections' training modules, which covered a variety of topics. Some of those training programs were presented by Wexford employees. Wexford's physicians received other training and had privileges to perform certain medical procedures. During the time period in question, physicians assigned to Big Muddy were authorized to perform minor surgeries using local anesthetics. There were no policies, guidelines, or directives regarding emergency response or decisions to send patients to off-site medical facilities for care. On-call physicians were not required to provide care in person when contacted by phone.

Defendant Cheri Laurent, also a registered nurse, was a regional manager for Wexford. She oversaw operations in eight prison facilities with healthcare units. Her duties included finances and budgeting, supervision of regional administrators, liaison with prison wardens, staff training on prison policies and procedures, and bidding on contracts. She also served as an auditor – a task designed to ensure that medical administrative directives were being followed. In December, 2000, and January, 2001, Wexford did not have any policy or practice that allowed her to override a

doctor's decision not to send an inmate for outside treatment upon request from nursing staff.

Defendant Kathy Bochantin was a registered nurse, employed by Wexford as the director of nurses at the Big Muddy facility. She prepared reports for Wexford and the State of Illinois and managed the nursing staff at the facility. He duties included orientation, training, supervision, and scheduling. She trained other registered nurses and licensed practical nurses regarding their roles and infirmary routines. She also arranged in-service training. She explained prison policies outlined in administrative directives and institutional directives. She worked with the health care administrator and a Wexford regional manager on staff issues. She did not view the role of a nurse as prescribing or practicing medicine but to follow the doctor's treatment plan. She was not aware of any policy, custom, or practice allowing a nurse to override a medical doctor's treatment decision and did not feel a nurse should override a treatment decision unless it was "way off the wall."

On December 31, 2000, Cori Reid called defendant Bochantin. She posted a comment in plaintiff's treatment records, indicating that she did not obtain Kathy Bochantin's permission to override Dr. Ruiz's decision not to send plaintiff to an outside medical facility for treatment.

A plaintiff suing for negligence under the common law of Illinois must show that the defendant breached a duty of care owed to him. *Chandler v. Ill. Cent. R.R. Co.*, 798 N.E.2d 724, 728 (Ill. 2003). Whether these defendants owed plaintiff a common law duty of care that encompasses supervision of a medical doctor and/or training to override a medical doctor's treatment decision is a matter of law. *Dezort v. Village of Hinsdale*, 342 N.E.2d 468, 470 (Ill. App. 1979). The determination involves weighing factors of public policy, such as foreseeability, likelihood of injury, and magnitude and consequences of placing the burden on the defendants. *Id.*

at 470-471.

Plaintiff does not offer authority suggesting that the Illinois courts have or would recognize a duty of care under these circumstances, and the Court has been unable to locate any such authority.[3]  Rather, Illinois courts recognize that the State must exercise ordinary and reasonable care for the inmate's health.  *DeWitt v. State*, 43 Ill. Ct. Cl. 254  (1991).  Claims based on a breach of that duty are not at issue here because plaintiff did not provide the required medical affidavit.

Plaintiff suggests that defendant Wexford may be liable under a theory of institutional negligence.  In Illinois, hospitals have a duty to exercise reasonable care in light of the apparent risk.  *Darling v. Charleston Community Memorial Hospital*, 211 N.E.2d 253 (1965).  In recent proceedings on a motion to dismiss, the Court construed the allegations against Wexford as an ordinary claim of negligent supervision and training (Doc. No. 129).  The Court did not detect an institutional negligence claim and will decline the invitation to recognize a separate theory of liability at this late stage of the proceedings.

In short, plaintiff has not shown that defendants Bochantin, Laurent, and Wexford had a duty under Illinois common law to supervise Dr. Ruiz and/or train his co-workers to override his medical treatment decisions.

## III.    Conclusion

IT IS ORDERED that defendants' motion for summary judgment (Doc. No. 167) is

---

[3] Plaintiff cites to *Advincula v. United Blood Services*, 678 N.E.2d 1009 (Ill. 1996).  In that case, the Illinois Supreme Court interpreted the legal duty imposed by Section 3 of the Blood Shield Act.  Plaintiff also cites to *Chuffo v. Ramsey*, 55 F.Supp.2d 860 (N.D. Ill. 1999), where a federal district court declined to exercise supplemental jurisdiction over state law claims.

GRANTED. Judgment shall be entered against the plaintiff and in favor of defendant Ruiz on Count I and against the plaintiff and in favor of defendants Bochantin, Laurent, and Wexford Health Services on Count II.

   **SO ORDERED:**   **October 20, 2008**   .

                                          *s/Philip M. Frazier*
                                          **PHILIP M. FRAZIER**
                                          **UNITED STATES MAGISTRATE JUDGE**